FRANK R. CHASE v. FRANK P. BOUGHTON, FRANKLIN LEE, ET AL.

*Vendor and vendee—Fraudulent representations—Equity jurisdiction.*

1. Representations as to the amount of timber on a tract of land, based, as claimed, upon the personal knowledge of the party making them, are not mere expressions of opinion, and, if false, the maker is liable for the consequent damage to one who purchases the land in reliance upon such representations.

2. Equity, having once taken jurisdiction to set aside the forfeiture of a land contract, and relieve the vendee because of the false

representations of the vendor as to the amount of timber on the land,—in which suit the vendor asks for the specific performance of the contract, and that the liability of the complainant to pay the remainder of the purchase price be fixed, —will adjust the conflicting claims to the purchase money in the same suit.

3. The purchasers of a tract of pine land on contract, after cutting a portion of the timber, assigned the contract, with the consent of the vendors, to a creditor, who, after lumbering on the land for a year, discovered that there was a shortage in the amount of timber represented to be on the land by one of the vendors at the time of the assignment, and upon which representations the assignee had relied. The vendors declared the contract forfeited, and the assignee filed a bill to set aside the forfeiture, and for an accounting as to the amount paid on the contract, the value of the timber removed from the land and of that remaining thereon, and for adequate relief in the premises, which is granted by decreeing a conveyance of the land to the assignee, it appearing that the value of the shortage in timber is equal to the unpaid purchase money.

Appeal from Lake. (Judkins, J.) Argued June 21, 1892. Decided October 4, 1892.

Bill to set aside the forfeiture of a land contract, and for other relief. Defendants Boughton and Lee appeal. Decree affirmed. The facts are stated in the opinion.

*Thomas F. McGarry, W. F. McKnight,* and *F. D. M. Davis,* for complainant.

*Norris & Norris* and *B. F. Graves,* for appellants.

GRANT, J. · In October, 1887, the defendants Boughton and Lee purchased a tract of land, chiefly valuable for pine timber, for which they paid $125,000. The tract consisted of forty-five forties. In October, 1888, they sold the land to Wilson, Luther & Wilson for $200,000, having in the meanwhile cut the timber from one 40, which had been burned over. The sale was evidenced by a written contract, fixing the dates and amounts of payments, and declaring time to be " of the very essence of the contract."

Wilson, Luther & Wilson entered upon the lands, and lumbered therefrom for one year, and meanwhile paid upon the contract the sum of $69,524.46. They then became involved in financial difficulties on account of the failure of a firm which was heavily indebted to them. Wilson, Luther & Wilson were indebted to complainant in the sum of $7,000. They executed an assignment of this contract to him, the sole consideration of which was $100. The assignment was absolute, and the consideration paid. Boughton and Lee gave their written assent to the assignment, which the contract required. Chase remained in possession of the land, and carried on lumbering operations for one year, and during that time paid upon the contract $73,045.02. Neither Wilson, Luther & Wilson nor Chase fully complied with the terms of the contract. They failed to make payments, and also cut timber contrary to its provisions. Boughton and Lee, however, frequently extended the time for making payments. December 9, 1890, Boughton and Lee declared the contract forfeited. January 16, 1891, complainant filed this bill, alleging that he had been defrauded by the false representations of defendant Boughton, and of Wilson, Luther & Wilson, and that in reliance upon these representations he purchased the contract. The alleged false representations are contained in the following allegations of the bill:

"That a short time prior to the 31st day of October, A. D. 1889, the said Wilson, Luther & Wilson, having previously become financially embarrassed and unable to pay their creditors in full, and unable to conduct a lumbering business and operation, and unable to make further payments upon said land contract, came to your orator, and severally and collectively represented to him that there was at least forty thousand dollars profit in the Boughton contract (which is hereinbefore set forth at length); that there was originally thirty to thirty-two million feet of merchantable pine and Norway timber thereon; that terms could be made with said Frank P. Boughton & Co. by which your orator would be enabled to

fulfill the contract as assignee of said Wilson, Luther & Wilson, and realize large profits therefrom; that your orator never had any previous experience in pine lumber or of pine lands, or the manufacture of pine lumber, or the carrying on of a lumbering operation of any kind; that he was loth to engage in said enterprise; that he had previously been a farmer, a dealer in real estate, and attending to loans and collections, and knew nothing whatever of the quality or quantity of pine timber while standing and growing on land; that the said Wilson, Luther & Wilson continued their importuning of your orator, until finally the said Frank P. Boughton, representing the firm of F. P. Boughton & Co., came to Belding, Michigan, and joined with said Wilson, Luther & Wilson in representations concerning the timber situated on the land covered by said land contract, and the great value in said contract; that then and there the said Frank P. Boughton, who well knew that your orator had no knowledge of pine or of estimating the same, represented to your orator that there had been more than twenty-two million feet of white pine and eight million feet of Norway timber on said tract of land before any had been cut therefrom; that he knew this to be a fact, because he himself had gone over the larger portion of said land, and knew the same to be as represented, of his own personal knowledge; that the said Frank P. Boughton then and there referred to said land contract and schedule incorporated in said land contract, and represented that the price set opposite each governmental subdivision in said schedule *was based upon their (said Frank P. Boughton & Co.'s) estimate* of the amount of timber thereon, at the following prices, viz., eight dollars per thousand feet for white pine, and five dollars per thousand feet for Norway, and that, as a matter of fact, the timber actually on said lands would overrun the estimate made thereon as represented in said schedule; and the said David E. Wilson, William A. Luther, and Robert M. Wilson then and there represented that they had long known the said Frank P. Boughton, and knew him to be in every way responsible for what he said, and entitled to unlimited confidence; and said Boughton said that if the contract was allowed to become forfeited he would not enter into a new contract to sell the same for a price equaling the amount then remaining due on said contract; that when your orator suggested that the contract seemed ironclad as to the times of payment, the said Frank P. Boughton replied that, while that was true, still, so long as the interest and taxes were paid, and no more timber cut than was paid for, the contract might be

continued indefinitely, provided your orator took an assignment thereof; that your orator believed the statements and representations of the said Frank P. Boughton and the said Wilson, Luther & Wilson to be true, and entirely relied thereon."

The bill then alleges that complainant, on the 5th day of January, 1891, caused a careful estimate of the timber remaining on the lands to be made, and that he then ascertained for the first time that there was a shortage of from 7,000,000 to 10,000,000 feet of white pine.

The prayer of the bill is as follows:

1. That the contract of assignment by Wilson, Luther & Wilson be set aside, rescinded, and canceled.

2. That Boughton and Lee come to an account as to all the moneys received by them on said contract, and that an account be taken of the timber cut and the value thereof, and of the timber still standing and the value thereof.

3. That complainant have a decree for the amount of money paid on said contract, less the value of the timber removed, and that complainant have a decree for a lien upon the land for that amount.

4. Or if, upon the incoming of the proof, the court shall deem it more in accordance with equity, that the alleged forfeiture be set aside, and that a proper deduction be made from the contract price by reason of the shortage of said timber.

5. Or if it shall appear that the amount paid sufficiently pays for all the timber on said land, that Boughton and Lee be decreed to deed said lands to complainant.

Defendants Wilson and Wilson, survivors of the firm of Wilson, Luther & Wilson, answered, virtually admitting the allegations in the bill, and claiming that their statements to Chase were based upon the information they received from Boughton at the time of their purchase.

The decree was that Boughton and Lee deed the land to complainant, and that the contract and notes executed by Wilson, Luther & Wilson be delivered up and canceled; the court holding that the shortage in the pine amounted to the

difference between the contract price and the amounts paid upon the contract by Wilson, Luther & Wilson and complainant.

The following facts are established by the evidence:

Wilson, Luther & Wilson entered into a preliminary contract with Boughton and Lee, September 27, 1888, for the purchase of these lands. A final contract was to be entered into on or before October 10 following, and was in fact made October 9. Both contracts provided that Wilson, Luther & Wilson should be entitled to cut the pine from any government subdivision according to estimates then in possession of T. R. Welch and R. L. Russell; the former having made the estimate for Boughton, and the latter for Wilson, Luther & Wilson. These men were both expert woodsmen and estimators of standing timber. During the time that Wilson, Luther & Wilson had possession of these lands and carried on their operations, they made no complaint of any shortage. Chase made no complaint of any shortage until November 12, 1890, when he wrote Boughton and Lee as follows:

"The seven forties we have cut have fallen short of the estimate 1,300 M, and we have been on 2, 12, and 1 with 1,500 more; 11 and 15 to get before we go back on your timber."

It will be observed that this letter refers to "the estimate," not to any representation of fact as to the amount of timber. There was frequent correspondence during all this time between Chase and Boughton and between Wilson, Luther & Wilson and Boughton, asking for extensions of time, which Boughton usually granted. In all this correspondence there is not even a hint of any false or fraudulent representations by Boughton, who conducted all the negotiations on the part of his firm. No

charge or hint of fraud is made until the bill was filed in this cause. There is no claim of any concert of action between Boughton and Wilson, Luther & Wilson in making the sale to complainant. Boughton knew nothing of any of the conversations which took place between complainant and Wilson, Luther & Wilson. At the request of Wilson, Luther & Wilson, Boughton went to the village of Belding, where he met them and complainant in the bank of which complainant was an officer, and where the alleged false representations were made. Boughton did not know why he was called there until after his arrival at the bank, when he was informed by one of the Wilsons that they proposed to assign the contract to complainant, and desired his written consent thereto. Chase had ample time to examine the property, and in fact went over a portion of it with Mr. Luther, a Mr. Tucker, and Mr. Russell, the estimator for Wilson, Luther & Wilson, and knew at that time that Russell had made an estimate of the pine upon these lands. He also took with him a Mr. Cairnes, an experienced lumberman and his friend, for the purpose of obtaining his advice. They together went upon four sections. Complainant knew that Boughton had never made an estimate himself, and in fact had never been over all the lands. Boughton did not know Chase, and was introduced to him by the Wilsons, at this interview, for the first time. No consideration passed from complainant to Boughton in the transaction. Boughton had nothing to gain by the assignment of the contract to Chase, and no occasion existed for his making any false representations.

In the light of these facts, we now come to the representations testified to by complainant. The conversation took place in the directors' room in the bank, and was participated in by complainant, Boughton, the two Wilsons, and Luther. The following is the testimony.

" *Q.* What was said?

" *A.* In regard to the assignment of the contract, and to know if Mr. Boughton was willing to have it assigned to me,—to consent to an assignment; and in regard to the terms of the contract; and, if I took the contract, would I be granted leniency in the payments,—the time extended, if it was necessary. You understand, my arrangement and my talk with Tucker, Hoops & Co., or with Wilson, Luther & Wilson, was that I didn't expect to put into this contract only about $12,000, and the balance of the payments were intended to be made from the sale of the lumber cut from this tract, and, if the lumber would be unfit for market, it would be necessary that it should remain some time in the yard to dry, before it could be sold; and at that time I didn't know what arrangements could be made with Tucker, Hoops & Co. that would be satisfactory to me in regard to the matter, and I also wished to know from Mr. Boughton how much there was due on the contract, and how much pine there was on the land.

" *Q.* State what was said in that regard, and state the language as near as you can; and, if not the exact language, the substance of it.

"*A.* Mr. Boughton assured me that there had been over 30,000,000 feet of lumber on this track before any was cut, and he also said he considered it one of the finest pieces of pine there was in northern Michigan. And I wished him to make a new arrangement in case this contract should become void. Wilson, Luther & Wilson feared there might be some litigation from the creditors in regard to the matter, although by the terms of the contract it was very nearly, or had but a short time to run before it could be voided. And I asked Mr. Boughton the question if he would make a new contract with me on the same terms if that contract should become void, and Mr. Boughton said he would not do so, for he considered the pine worth a good deal more than the contract price, and if he owned it to-day he would not sell it for any such money. * * * I asked Mr. Boughton if he was sure that the pine would hold out to the estimate; and in answer to that question Mr. Boughton said, ' I can assure you, Mr. Chase, it will fully hold out to the estimates, and more, too, because I have been over a large portion of it myself, and know the quality of the pine.' * * * Mr. Robert M. Wilson and Mr. Boughton were talking about the

original purchase, and Mr. Robert M. Wilson said to Mr. Boughton: 'You know, Mr. Boughton, we bought that pine upon your estimate, and I told you at the time that I would not have bought a piece of pine upon any other man's estimate, and would not have taken another man's statement in regard to the amount of the pine but yours. But we have known you so long, and I had adjoining farms with you, and knew your father, that we had perfect confidence in your statements in regard to the matter.'"

After this interview, complainant made arrangements with Tucker, Hoops & Co. to manufacture and sell the timber, but no settlement has yet been had between this firm and complainant for the lumber so manufactured and sold. On cross-examination complainant testified that he understood Mr. Boughton's statement, "I can assure you it will fully hold out to the estimates," to be his opinion.

It requires no argument or citation of authorities to show that an opinion as to the quantity or quality of an article sold affords no foundation for relief in equity, or recovery of damages at law. Boughton did not guarantee the amount or quality, either verbally or in writing. What he said was based upon estimates, which common experience tells us always differ. Chase purchased with a knowledge that these statements were based upon estimates of others, whose estimates were within his reach, and that the statements of Boughton were not based upon personal knowledge. They were made and received as an opinion. If such opinion has proved erroneous, he who chose to act upon it must suffer. Opinions, however strong and positive, furnish no basis for relief in equity.

The representations made to complainant by Wilson, Luther & Wilson are immaterial here; so also are the representations made by Boughton to Wilson, Luther & Wilson, when they purchased the lands. Neither can be made the basis of a recovery here against Boughton. If Boughton committed a fraud in selling the lands to Wil-

son, Luther & Wilson, an action for that fraud is not assignable. *Stebbins v. Dean,* 82 Mich. 385, and authorities there cited. It is therefore unnecessary to state or discuss what then took place between them. Wilson, Luther & Wilson are evidently friendly to complainant; still they are not here as complainants, and their rights are not in issue.

But complainant cannot maintain his bill for other reasons. Boughton cannot be placed *in statu quo.* Complainant and his assignors lumbered upon this property for 2 years and 2 months, during which time they cut off 13 forties. They cut timber in violation of the contract, and some of the land has been burned over. Equity cannot, therefore, restore the defendants Boughton and Lee to their former condition. Complainant's remedy, if he had any, would therefore be an action at law to recover damages, which remedy is ample and complete. There is no necessity for an accounting, because the contract price is fixed, the payments are conceded, and the amount of timber cut exclusively within the knowledge of complainant. The only question in such case would be, were Boughton and Lee guilty of fraud? and, if so, what damages did complainant suffer in consequence thereof? These are proper questions for a jury, should either party desire it. Under the facts of this case, there is no ground for the interposition of a court of equity, except to relieve from the declared forfeiture. Upon receiving notice of the forfeiture complainant was relieved from further payments for uncut timber, and his right of action for damages for any fraudulent representations immediately accrued. He did not need the interposition of a court of equity to give him damages. He does not want the forfeiture set aside unless the court will deduct what damages he claims to have suffered. The effect of the decree is to make a new contract between Boughton and Lee and the complainant, the assignee of the original contract. This is not the province of a court

of equity. It deducts $57,430.52 from the contract price, and compels Boughton and Lee to sell their property at such sum as the court has deemed equitable. The learned circuit judge, in his opinion, says: "Boughton and Lee have already received much more on this contract than they gave for the timber." In exact figures, they have received $17,569.48 more than they paid for it. But, allowing interest on the amount they paid until this money was received, and they have received only about $8,000 above the contract price, which is certainly not a very large profit on so large a transaction. It certainly does not justify a court of equity in fixing an equitable price for the land. Parties may fix any price they choose for the sale of their property, and purchasers will not be relieved because they have made hard bargains.

In regard to the fraudulent representations claimed to have have made to Wilson, Luther & Wilson, the learned circuit judge said:

"Were Wilson, Luther & Wilson the complaining parties, some question might arise as to whether they relied suffi- ciently on Boughton's representations to justify relief in case of fraud, for the reason they were practical lumber- men, had made some examination of the lands and timber, were near by, and had in their employ a capable estimator, who could soon have estimated all the timber, had it been deemed needful."

In my judgment, the claim of Wilson, Luther & Wilson is stronger than that of complainant. If Wilson, Luther & Wilson have no cause of action, they certainly cannot create one for Chase by repeating the representations to them.

This disposal of the case renders it unnecessary to state or discuss the estimates made by the different witnesses. They are immaterial to the issue between complainant and the defendants Boughton and Lee.

The defendants Boughton and Lee concede that the for-

feiture may be set aside, and complainant allowed a reasonable time in which to pay the balance of the contract price, if he elects so to do. The decree should be reversed as to them, and decree entered in this Court setting aside the forfeiture, and giving complainant 90 days within which to pay the amount still due upon the contract. The defendants Boughton and Lee should recover costs of both courts.

McGRATH, J. I cannot agree with the conclusion arrived at by Mr. Justice GRANT.

In 1885 one Peters bought this land upon an estimate of 22,000,000 feet. In 1887, Peters sold to Boughton and Lee upon an estimate of between 22,000,000 and 23,000,000. Priceler, who sold the land for Peters, and received $500 from Peters for negotiating the sale, made a re-estimate of the timber, in company with Welch, who was in the employ of and was acting for Boughton and Lee. Afterwards Priceler and Welch, in company with Boughton, went upon the land, spending not to exceed five or six hours upon the 1,800 acres. This was the only examination that Boughton made of the land, and Boughton testifies that he accompanied them for two or three hours, and then sat down in the woods, and waited until they had completed the tour. Priceler testifies that, when estimating in company with Welch, he reported to Welch his figures as they went along. He says, also, that he reported his estimate to Boughton as between 22,000,000 and 23,000,000. Welch says that he has lost his figures made at that time, but, as near as he can remember, they aggregated 26,400,000, and that he so informed Boughton. After Boughton and Lee sold to Wilson, Luther & Wilson, Priceler had a conversation with Boughton, in which Boughton told him of the sale and the price, and Priceler remarked, "That was a good deal." Boughton said, "Yes, it was a good deal." Priceler then asked if he had the

bargain in good shape in the contract, and Boughton said, "We have made no boy's bargain."

After the talk about selling to Wilson, Luther & Wilson, Boughton directed Welch to make an estimate, and Welch claims that he took his figures made when Priceler and he made the estimate, and made out the written estimate of each 40, upon which the sale was made to Wilson, Luther & Wilson, and according to which the total is 30,100,000. He claims that the difference between the 26,400,000 and the 30,100,000 is the difference between the log scale and the lumber tally, but, although pressed to state the basis of his estimate of the difference, he avoids the question. Welch admits that he was to receive $6,000 from Boughton and Lee for his part in the transaction. The testimony is that the difference between the log and the mill tally would depend upon the method of cutting. If cut by a circular into boards, there would be little difference, but, if cut into bill stuff, the difference would be from 15 to 20 per cent. The testimony also shows that estimates are usually made on log cut. The Wilsons testify that Boughton and Lee represented that they had purchased this timber upon a 30,000,000 estimate, log tally, and that it would saw out 32,000,000, as the mill tally always overran.

These estimates are not intended to be mere opinions, derived from cursory observations. They are usually made by experts, who make that a business, and who go into the presence of every tree, with book and pencil, and from size and length and appearance of the tree make calculations, and these calculations are made the basis of purchase and sale. In the contract in this case the estimate furnished by Boughton was made a part of the contract. In the estimate the description of each 40 is given, then the value of the timber, then the number of feet of good, then the number of feet of common, then the number of feet of Norway, then the log run, and at the head of each

column of good, common, and Norway is given the price per thousand. In the contract the descriptions and values only are given, and they are made the basis of the payments. The white pine is figured at eight dollars per thousand, and the Norway at five dollars.

Complainant says, referring to the conversation with Boughton:

" We talked about the schedule price, and Boughton said the schedule price of each 40 was based upon his [Boughton's] estimates of the amount of timber upon each 40."

In Boughton's presence, at that time, one of the Wilsons said to complainant that they had been acquainted with Boughton a long time, and "I [complainant] could rely upon anything that Mr. Boughton might tell me in regard to the matter."

Robert M. Wilson says:

" Mr. Chase spoke up, and said, ' I am a farmer, and don't know anything about lumbering. Suppose the pine is not there, Mr. Boughton, and Chase gets into a hole, who will help him out?' Mr. Boughton says: ' Mr. Chase, I have looked over a large portion of that pine myself. I will assure you that the quantity will hold out.' I asked Mr. Boughton what their estimate was, and he said it was 22,000,000 white and 8,000,000 feet of Norway. He said, ' It will cut more than our estimate.'"

David E. Wilson testifies that—

" Chase said, ' I am not a lumberman. I know nothing about it whatever. I wanted to see you [Boughton] about the terms of the contract, and the quality of the timber, to know what there is of it.' Boughton said: ' I can assure you the timber is there. I have been on a large portion of that land myself, and I know that it will hold out to the estimate in quantity and quality.'"

Before the final contract was entered into between Boughton and Lee and Wilson, Luther & Wilson, a memorandum agreement was made, dated September 27, 1888, which provided that payments were to be made " according

to estimates now in possession of T. R. Welch and R. L. Russell." According to Boughton, the subsequent contract provided that payments were to be made in accordance with estimates which were prepared by Welch upon the basis of the mill tally, at Boughton's instigation, after the execution of the preliminary contract, and that the object of this last estimate, which had been inflated from 3,000,-000 to 5,000,000 above the figures which now exist only in the minds of Boughton and Welch, was that he "wanted a statement of the estimated amount of stuff on the land, so that when it became necessary to draw a detailed contract I would have something to go by, if the other people didn't, or be prepared to make a detailed contract." If Welch already had estimates, as the first agreement clearly indicated, why was it necessary to substitute others? The contract provided that those already prepared would be the basis, and why, in any event, substitute inflated estimates? No detailed estimates were ever submitted to the Wilsons by Boughton except these, and the Russell estimate referred to was undoubtedly that made of but five forties for the purpose of comparison with the Boughton estimate of the same forties.

It is not necessary to go into the question as to whether or not Wilson, Luther & Wilson were misled. The defense claim that Boughton's representations to complainant were mere matters of opinion; that the figures given in the estimate upon which the payments in the contract were based were the mill tallies, and not the log tallies; and that the representations made by Boughton to Chase were based upon estimates made by a competent man. As bearing upon this defense, it was competent to go into the entire history of these estimates, so far as Boughton knew of their character, as well as into what he said to the Wilsons, or to anyone else, as to whether they were based upon log or lumber tally. Mr. Peters, a competent lumberman, tes-

tified that any material difference between the log and the lumber tally would depend upon whether the logs were to be cut with a band saw or a circular, or whether they were to be cut into inch boards or bill stuff.    The same witness says that estimates upon which stumpage is sold are based upon the log tally.    The possibilities determine the stumpage value.    There were no "ifs" in the estimate, or in the representations to Chase, and no intimations that the representations were based upon the lumber, and not the log, tally.    Boughton had bought this land upon an estimate of from 22;000,000 to 23,000,000.    He had spent two hours in looking over the timber in company with Priceler and Welch.    Priceler had given his estimate to Boughton at between 22,000,000 and 23,000,000.    Welch testifies that he gave Boughton his figures at 26,400,000.    In the contract the prices are fixed, and the sum to be realized from each 40 at those prices is named.    Wilson, Luther & Wilson become insolvent, and are unable to carry it out. They owe Chase $7,000, and, in order to get his money, he takes an assignment of their contract, and he pays them $100.    Before the assignment Chase goes to Boughton, and tells him that he is not a lumberman, and knows nothing about the business, and in Boughton's presence the Wilsons assure Chase that he may rely upon whatever Boughton tells him.    Boughton then tells Chase that the schedule price (in the contract) of each 40 is based upon his (Boughton's) estimate of the amount of timber on each 40; that his estimate was 22,000,000 feet of white pine, and 8,000,000 feet of Norway, and that it "would cut more than our estimate;" that he (Boughton) had looked over a large portion of that pine himself, and "I will assure you that the quantity will hold out."    Chase then said to Boughton, "Your assurances to me are satisfactory, and, if I can make proper arrangements with Tucker, Hoops & Co. to manufacture the lumber, I shall take the contract."

These statements made by Boughton to Chase were not mere expressions of opinion; nor did Boughton then claim that they were predicated upon the estimates of others. They were representations of fact, alleged to be based upon personal knowledge. Chase made no further inquiry as to the quantity of the timber, but relied upon what Boughton said.

In *Holcomb v. Noble*, 69 Mich. 396, the representations were contained in a letter written by the vendor, which contained the following:                              .

"I had as good a judge of pine as there is in Michigan examine this land, and a good judge of pine, and he estimates that there is about five million pine on the land, one-half of which is white pine, and the rest Norway; and he says that this is a very low estimate, and that the pine is of good quality. The white pine is scattering among hard wood, which usually indicates first-class pine. The land is worth, for farming purposes, $5 per acre after pine is off, and this is price of farming land in this locality. The land is close to logging stream, which carries logs to Alpena. There are quite a number of good farms in same township. I hold lands at $12.50 per acre, and think there is enough pine on land to pay for it at that price."

The Court say:

"It is admitted that in equity an actual design to mislead is not necessary if a party is actually misled by another in a bargain. There was abundant evidence in this case to authorize the jury to find that defendant, whether honestly or dishonestly, expected plaintiff to act on his representations of the reliableness of the reports which he produced, and that plaintiff did rely on them. There is no reason for a difference in action in such cases between courts of law and courts of equity."

It is urged that Boughton and Lee had nothing to gain by the assignment of the contract to Chase; but this contention cannot be maintained. Wilson, Luther & Wilson were insolvent. They must necessarily have ceased operations. Boughton & Co.'s interest was in a continuance of

operations.    Complainant's purchase meant a continuance of operations, and a continuance of gain to Boughton and Lee.    They realized from Chase's operation thousands ·of dollars for timber ˌthat was not there.    Defendants Boughton and Lee claim the benefit of a cross-bill, and pray that complainant may be decreed to perform the said contract.

It is next contended that complainant was guilty of laches; that he lumbered the lands for a year before complaint was made.    But Chase had let the contract to manufacture to Tucker, Hoops & Co., who had not reported to Chase the cut with reference to the area, until November, 1890, at which time the shortage then discovered was immediately reported to Boughton and Lee. No laches can be imputed because Chase relied implicitly upon Boughton's representation, and did not hunt for fraud, or presume that the quantity of timber had been misrepresented.

It is next insisted that complainant's remedy is by an action at law, and that equity has no jurisdiction of the question of damages.    The contract price was $200,000. Boughton and Lee have received $142,580.62, inclusive of interest.    The contract has been declared forfeited.    According to Boughton's estimate, 17,161,223 feet of timber remain uncut.    Three estimates were made of the remaining timber after the declaration of forfeiture.    The average of these fixes the amount uncut at 6,360,567, leaving a shortage of 10,800,656, or over one-third of Boughton's estimate.    One-third of the purchase price would be $66,666.66. The $142,580.62 received by Boughton and Lee includes interest, but it includes interest on this $66,666.66 for over two years, amounting to $9,333.33.    The principal paid and this interest amounts to about $137,000.    Add to this amount the shortage value, and we have $203,666, or an amount in excess of the contract price.    Complainant's

damage could not be less than the shortage value. Boughton and Lee have declared this contract to be forfeited, and complainant has been forced into a court of equity to have that forfeiture set aside. Having jurisdiction of the matter for relief which can only be obtained in equity, the court will not hesitate to retain its cognizance to dispose of the entire controversy. *Miller v. Stepper*, 32 Mich. 194; *Rickle v. Dow*, 39 Id. 91; *McKinney v. Curtiss*, 60 Id. 611; *Wallace v. Wallace*, 63 Id. 330; *Horton v. Hubbard*, 83 Id. 123. In the latter case, the Court say: "Equity, having once taken jurisdiction to enforce the contract, will retain it to adjust the conflicting claims to the purchase money."

In the present case, defendants Boughton and Lee have asked the court to decree specific performance of the contract according to its terms, and to fix complainant's liability to pay the balance of the purchase money. Complainant asks relief from the obligation to pay because of the fraud upon him, and a court of equity will not relegate him to his remedy at law, and compel him in the mean time to make further payments to protect his right to the property.

The decree of the court below should be affirmed, and it is so ordered.

MORSE, C. J., concurred with McGRATH, J. LONG and MONTGOMERY, JJ., did not sit.